UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TERRANCE D. CURRAN,          )     CASE NO. 4:15CV2648
                             )
            Plaintiff,       )     JUDGE PATRICIA A. GAUGHAN
                             )
            v.               )     Magistrate Judge George J. Limbert
                             )
CAROLYN W. COLVIN[1],        )
ACTING COMMISSIONER OF SOCIAL )    REPORT AND RECOMMENDATION
SECURITY ADMINISTRATION,     )     OF MAGISTRATE JUDGE
                             )
            Defendant.       )


        Plaintiff Terrance D. Curran ("Plaintiff"), requests judicial review of the final decision of

the Commissioner of Social Security Administration ("Defendant") denying his application for

supplemental security income ("SSI").  ECF Dkt. #1.  In his brief on the merits, filed on April 8,

2016, Plaintiff asserts that the administrative law judge ("ALJ") (1) failed to properly evaluate the

opinions of his treating physicians  and (2) did not properly evaluate Plaintiff's credibility.  ECF

Dkt. #10.  On June 22, 2016, Defendant filed a response brief.  ECF Dkt. #13.  Plaintiff did not file

a reply brief.

        For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's

decision and REMAND Plaintiff's case for re-evaluation of the opinions of Drs. Kuivila and Rothner

with sufficient explanation of the weighing and treatment of those opinions.

## I.     FACTUAL AND PROCEDURAL HISTORY

        On January 27, 2012, Plaintiff filed an application for SSI alleging disability beginning

August 29, 1987.  ECF Dkt. #9 at 174-180 ("Tr.").[2]  Plaintiff's application was denied initially and

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security,
replacing Michael J. Astrue.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in
the CM/ECF system rather than the page numbers assigned when the Transcript was compiled.  This allows
the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing
the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

upon reconsideration. *Id.* at 126-134. Following the denial of his application, Plaintiff requested an administrative hearing, and, on April 11, 2014, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 39, 136. On June 11, 2014, the ALJ issued a decision denying Plaintiff's application for SSI. *Id.* at 19-34. Plaintiff requested a review of the hearing decision, and on October 27, 2015, the Appeals Council denied review. *Id.* at 1-16.

On December 18, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on April 8, 2016. ECF Dkt. #10. On June 22, 2016, Defendant filed a response brief. ECK Dkt. #13. Plaintiff did not file a reply brief.

## II.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

Since Plaintiff focuses solely on his physical impairments in his brief, the undersigned will summarize the medical evidence relating only to his physical impairments.

### A.    Medical Evidence

On July 29, 2011, Plaintiff was evaluated by Dr. Anton[3], a neurosurgeon, at the request of Dr. Kuivila[4], Plaintiff's treating pediatric orthopaedic and scoliosis surgeon at the Cleveland Clinic. Tr. at 293. Dr. Anton noted that Plaintiff was 23 years old and had a diagnosis of neurofibromatosis, type I, von Recklinghausen's disease[5]. *Id.* He indicated that Plaintiff had a spinal deformity that Dr. Kuivila had been following and referral was made to Dr. Anton for an opinion about Plaintiff's syrinx[6]. *Id.* Plaintiff reported that over the years, he had been stable, but over the last six months,

---

[3] Dr. Anton is a neurological surgeon at the Cleveland Clinic. *See* http:/my.clevelandclinic.org/staff_directory.

[4] Dr. Kuivila is an orthopaedic surgeon at the Cleveland Clinic and is the Vice Chair of the Orthopaedic and Rheumatologic Institute. *See* http://my.clevelandclinic.org/staff_directory.

[5] This disease is a rare genetic disorder whereby patients develop multiple benign tumors of nerves and skin and areas of abnormally decreased or increased coloration of the skin. http://www.webmd.com/children/neurofibromatosis-type-1-nf-1. Additional abnormalities may be present, including skeletal malformations, including progressive curvature of the spine (scoliosis), bowing of the lower legs, and improper development of certain bones. *Id.*

[6] A syrinx is a cyst which forms within the spinal cord. www.ninds.nih.gov.

he had increasing pain, loss of dexterity on the right side, and a decreased ability to ambulate. *Id*.

Upon examination, Dr. Anton indicated that Plaintiff had full strength in his bilateral deltoid, biceps, triceps, and hand intrinsic muscles. Tr. at 293. He was hyper-reflexic, had full strength in his left lower extremity, and normal sensation for light touch and discrimination. *Id*. Dr. Anton reviewed Plaintiff's scoliosis imaging studies, which showed that from C2 to T2, Plaintiff had a 73-degree curve and from C7 to T4, Plaintiff had a 50-degree curve. *Id.* He indicated that a full spine MRI showed evidence of von Recklinghausen's disease and a patchy thoracic syrinx in the conus and mid thoracic spine. *Id.* Dr. Anton advised that he did not recommend a separate neurosurgical procedure for the syrinx which had been stable and it was most likely due to Plaintiff's deformity and disease progression. *Id*. He recommended that Plaintiff return to Dr. Kuivila for his deformity and a possible correction procedure. *Id.*

On August 19, 2011, Dr. Rothner, Plaintiff's neurologist at the Cleveland Clinic, examined Plaintiff for his neurofibromatosis. Tr. at 385. Plaintiff reported that he had a scoliosis surgery planned. *Id*. Dr. Rothner noted that Plaintiff had no new problems with vision, balance, weakness, confusion or loss of consciousness, but he complained of a lesion on his back that bothered him and hurt. *Id*. Plaintiff's neurologic examination was normal, including his motor and muscle strength, reflexes and cranial nerves. *Id.* at 383. Plaintiff's gait was noted as narrow-based, with no ataxia, normal tandem gait, normal heel walking and toe walking, and normal squat and recovery. *Id*. Dr. Rothner diagnosed neurfibromatosis, leg issues, scoliosis and back pain. *Id.*

On August 24, 2011, Plaintiff presented to Dr. Rothner, and he noted that Plaintiff had no new problems with vision, balance, weakness, confusion or loss of consciousness, and no complaints pertaining to his skin. Tr. at 382. His neurologic examination was normal, including his motor and muscle strength, reflexes and cranial nerves. *Id.* at 383. Plaintiff's gait was noted as narrow-based, with no ataxia, normal tandem gait, normal heel walking and toe walking, and normal squat and recovery. *Id*. Dr. Rothner diagnosed neurfibromatosis, leg issues, scoliosis and back pain, with no change in Plaintiff's status. *Id.*

On September 16, 2011, Dr. Kuivila discussed the scoliosis posterior spinal fusion surgery with Plaintiff that was scheduled for October 20, 2011, since Dr. Anton advised that the syrinx did

not preclude the surgery.  Tr. at 287.  Dr. Kuivila noted that Plaintiff had a history of plexiform neurofibromatosis with a large plexiform neurofibroma on the left side of his midback.  *Id.* at 288. Dr. Kuivila noted that neurology had concerns about muscle wasting and symptoms of possible claudication to Plaintiff's right lower extremity.  *Id.*  Dr. Kuivila diagnosed plexiform/von Recklinghausen disease, neurogenic scoliosis and right lower extremity pain with ambulation.  *Id.*

On October 20, 2011, Plaintiff was admitted to the Cleveland Clinic and Dr. Kuviila performed a posterior spinal fusion for Plaintiff's diagnosis of scoliosis with neurofibromatosis.  Tr. at 274-278.  He also underwent an excision of the neurofibroma along his left lower back that was causing him pain.  *Id.* at 418.  Plaintiff developed aspiration pneumonia following the surgery and was kept hospitalized until October 31, 2011, when he was discharged in satisfactory condition. *Id.* at 274-275.

On December 9, 2011, Plaintiff followed up with Dr. Kuivila and Dr. Kuivila noted that "[t]oday, he is doing very well."  Tr. at 284.  Dr. Kuivila also indicated that Plaintiff's "overall balance is markedly improved from surgery."  *Id.*  Plaintiff was told to return in four months.  *Id.*

On the same date, Dr. Kuivila wrote a letter for SSI purposes indicating that Plaintiff was a patient and describing the posterior spinal fusion that he performed on Plaintiff.  Tr. at 300, 499. He indicated that Plaintiff had instrumentation placed in various levels of his spine and he had 8 levels of osteotomies to improve his mobility before the instruments were placed and the fusion completed. *Id.*  Dr. Kuivila opined that for the next year, Plaintiff would be unable to work because he had limited mobility, still suffered from postoperative pain, and had no ability to do any significant lifting.  *Id.*  Dr. Kuivila continued in his letter that:

> After this one year period, Terrance will remain with significant lifelong limitations which will include a diminished capacity to do repetitive lifting of anything most likely greater than 15 pounds and certainly not on a repetitive basis.  He will have a permanent difficulty with lifting as he has a very long segment spinal fusion and would similarly have diminished capacity for walking and prolonged standing.

*Id.*

On February 22, 2012, Plaintiff presented to Dr. Rothner, who noted Plaintiff's surgery and Plaintiff's report that he had no new problems with his vision, balance, weakness, confusion or loss of consciousness.  Tr. at 306.  Plaintiff did indicate that his leg gave out occasionally and he suffered

-4-

constantly aching pain of a 5 on a 10-point scale, with 10 being the worst pain.  *Id.* at 309.  Upon examination, Dr. Rothner found no neurological or other abnormalities.  *Id*. at 306-307.  He scheduled Plaintiff to return in one year.  *Id*. at 307.

On April 19, 2012, Plaintiff presented to Dr. Bartholomew, Section Head of the Vascular Medicine Department at the Cleveland Clinic.  Tr. at 338, 613.  Dr. Bartholomew indicated that Plaintiff was referred for left foot swelling which had occurred since Plaintiff was 12 years old after he was hit by a car and broke three bones in his left foot.  *Id*.  Plaintiff said that he had no pain in the foot, but he had continued swelling and lately discoloration in the entire left foot and the right foot as well.  *Id*.  Plaintiff also reported pain and numbness in his posterior right thigh that started one year ago.  *Id.*  Dr. Bartholomew noted that Plaintiff had been and was in an aircast on his right foot for the last two to three months because he had pain in his ankle.  *Id*.

Upon examination, Dr. Bartholomew observed that Plaintiff's feet were cool and bluish in color and he had numerous tumors on his extremities, trunk and abdomen consistent with his neurofibromatosis diagnosis. Tr. at 339.  Plaintiff's neurological examination was otherwise normal, along with his range of motion in his hips and knees.  *Id*. at 339-340.

Dr. Bartholomew also performed pulse volume recordings, which showed that Plaintiff had reversible vasospasm, but no deep vein thrombosis.  Tr. at 340.  Dr. Bartholomew indicated that Plaintiff had multiple perivascular masses in both of his lower extremities but there was no evidence of venous compression or obstruction related to the masses.  *Id*.  Dr. Bartholomew diagnosed acrocyanosis[7].  *Id*. at 340-341.  He also ordered blood tests, including a thyroid test.  *Id*.

An April 29, 2012 arterial physiology study of Plaintiff's lower extremities showed that Plaintiff had Raynaud's Phenomenon[8].  Tr. at 349-350.

---

[7] Blueness of the extremities (the hands and feet). *See* http://www.webmd.com/skin-problems-and-treatments/acrocyanosis.

[8] Raynaud's Phenomenon is a disorder that affects the blood vessels in the hands and feet, causing the blood vessels to narrow when a person is cold or feeling stress.  See http://niams.nih/gov/health_info/ Raynauds_Phenomenon/raynauds/ff.  During an attack, the fingers and toes can change colors from white to blue to red and they may also feel cold and go numb from the lack of blood flow.  *Id*.

-5-

On July 31, 2012, Plaintiff presented to Dr. Kuivila complaining of throbbing, dull, aching pain in his neck, upper and lower back, right back thigh, right knee, right calf, right lower leg, and in his right and left feet.  Tr. at 346.  He rated the pain as a 6 out of 10.  *Id.*

July 31, 2012 x-rays concerning Plaintiff's scoliosis showed no significant interval change from the April 13, 2012 x-rays.  Tr. at 352.  The impression was stable post-operative changes.  *Id.*

On October 11, 2012, Dr. Kuivila wrote a "To Whom it May Concern" letter indicating that Plaintiff was his 25-year old patient who had undergone a T1-L1 posterior spinal arthrodesis with posterior segmental instrumentation on October 20, 2011.  Tr. at 497.  Dr. Kuivila noted that Plaintiff had been followed at the Cleveland Clinic for the last 12 or more years for his neurofibromatosis type 1 with a great number of cutaneous plexiform neurofibromas.  *Id.*

Dr. Kuivila continued that although Plaintiff's neurologic status concerning his strength and gait were normal, "he does, however, have significant physical limitations with respect to how long he can sit, how far he can walk and what he can lift," due to his condition and persistent spinal deformity.  Tr. at 497.  He also noted that Plaintiff continued to experience pain, which continued to be a major issue that made full-time employment very difficult.  *Id.*  Dr. Kuivila also indicated that due to the number of neurofibromas that Plaintiff had via cutaneous manifestations and those deep in various nerve roots, Plaintiff was at a significant risk for malignant degeneration in the future.  *Id.*  Dr. Kuivila opined that Plaintiff was not a candidate for full-time gainful employment at anytime in his life due to his pain and physical limitations.  *Id.*  He concluded that Plaintiff's overall function would continue to deteriorate and Plaintiff would never be pain-free.  *Id.*

On October 12, 2012, Dr. Kuivila penned an addendum to his prior letter, indicating that Plaintiff's condition was a life-long condition that had manifested itself when Plaintiff was 2 or 3 months old and Plaintiff had not been able to work for any of his adult life due to his condition.  Tr. at 498, 609.

On December 18, 2012, Plaintiff presented to Dr. Samuel at the Pain Management Clinic at the Cleveland Clinic for his back pain.  Tr. at 514, 537, 603.  Plaintiff indicated that the back pain began ten years ago and he had been taking Ultram, Neurontin, Zanaflex, Mobic and Oxycodone as well as Ambien or Valium to help him sleep.  *Id.*  He indicated that the pain interfered with

physical activity, sitting, walking, bathing and lifting, and was mitigated by lying down and heat, for which he spent 12 hours per day reclining.  *Id.*  Plaintiff had not responded to medications or physical and aqua therapy.  *Id.* at 516, 539, 605.

Physical examination showed that Plaintiff had negative straight leg raising, no pain to palpation over the spine, normal spinal range of motion, normal range of motion and strength in the upper and lower extremities, and symmetric upper and lower extremity coordination and muscle strength.  Tr. at 516, 538, 605.  Dr. Samuel noted that Plaintiff's gait was antalgic and he walked with a cane.  *Id.*  His plan was to wean Plaintiff off of Oxycodone and start him on a Lidoderm Patch.  *Id.*

On January 30, 2013, Plaintiff presented to Dr. Rothner for follow-up, reporting that he had no neurologic symptoms, but his main problem was his back pain.  Tr. at 543.  Dr. Rothner examined Plaintiff, finding that some of Plaintiff's neurofibromas had gotten bigger, but his neurologic exam was otherwise normal.  *Id.* at 544.

On May 14, 2013, Plaintiff presented to Dr. Samuel for follow-up on his back pain and he reported that his pain had been stable at a 7 out of a 10-point scale.  Tr. at 520, 598.  Plaintiff indicated that he had stopped taking Oxycodone and was taking Tramadol and his other medications with some relief, but he wanted further recommendations and management.  *Id.*  He described his pain as aching and sharp and indicated that any activity in excess exacerbated his pain.  *Id.*  Physical examination showed severe neurofibromas on both upper extremities, negative straight leg raising but pain to palpation over the entire spine, normal upper and lower extremity strength and range of motion, and a normal gait.  *Id.* at 522, 600.  Dr. Samuel recommended that Plaintiff take an extra 1-2 doses of Tramadol when his pain was severe and to increase his total Neurontin dosage to 3600mg.  *Id.*  He also noted that while he was happy to provide care to Plaintiff, he realized that he had to travel to see him more often and it was ok to stay on his current regimen with his other medical providers, with the increases in Tramadol and Neurontin.  *Id.*

On October 11, 2013, Dr. Kuivila wrote a "To Whom it may Concern" letter indicating that Plaintiff was his patient and was two years status-post instrumented posterior spinal fusion for scoliosis related to neurofibromatosis.  Tr. at 526.  He indicated that Plaintiff's balance was excellent

and no neurologic symptoms arose.  *Id*.  However, Dr. Kuivila maintained that Plaintiff's overall condition had not changed and his level of disability had not improved and no long-term improvement was expected.  *Id*.  Dr. Kuivila also noted that Plaintiff continued to see a pain management specialist and he had a new nodule on the right of his incision in his mid-thoracic area and was going to see Dr. Papay for evaluation.  *Id*.

An October 11, 2013 scoliosis x-ray indicated that there was no significant changes relative to Plaintiff's prior scoliosis examination on October 12, 2012.  Tr. at 534.

On December 16, 2013, Dr. Bartholomew wrote a letter explaining his evaluation of Plaintiff for his left foot swelling on April 26, 2012 and his diagnosis of Plaintiff with acrocyanosis upon examination and testing.  Tr. at 531.  He indicated that he had not seen Plaintiff since then.  *Id*.

On January 22, 2014, Plaintiff followed up with Dr. Rothner, who noted that Plaintiff had no new symptoms, but he still had back pain, occasional thigh pain, his knee gave out and he was walking with a cane.  Tr. at 552, 590.  Dr. Rothner found some bumps on Plaintiff's skin, but none that were painful, hard, or had rapid growth.  *Id*.  Dr. Rothner's neurologic examination was normal.  *Id*. at 553.  He increased Plaintiff's Neurontin by 400 mg.  *Id*.

On April 21, 2014, a lumbar MRI showed new postoperative changes in the thoracic spine with minor rotatory levoconvex scoliosis as stable to improved, multiple soft tissue masses typical for neurofibromas or nerve sheath tumors at L1-L2 to L5-S1, a minor disc bulging and little facet arthropathy causing mild spinal canal stensosis at L4-L5, and multiple soft tissue masses occupying the sacral neural foramen which likely reflected neurofibromas.  Tr. at 573-574, 622-623.  A cervical MRI on the same date showed status post thoracolumbar fusion procedure for scoliosis with improved levoconvex scoliosis at the cervicothoracic junction, mild dextroconvex scoliosis and straightening of the normal cervical lordosis, mild to moderate spondylosis at C6-C7 with cord contact without substantial spinal canal stenosis, developing minor disc bulging at C5-C6 without compressive features representing worsening from prior study, and bilateral neural foraminal masses showing postcontrast enhancement similar to that shown before consistent with neurofibromatosis.  *Id*. at 579-580.

On April 30, 2014, Plaintiff presented to Dr. Rothner for follow up and he reported that he had no new symptoms. Tr. at 556, 584.  Physical examination was mostly normal, although it showed that Plaintiff had bumps and lumps on his skin, particularly one on his left forearm that was growing and becoming more painful.  *Id*.  Plaintiff complained of constant, sharp pain down his entire spine and he had stopped physical therapy because it was too painful.  *Id.*  Dr. Rothner changed Plaintiff's Neurontin dosage to 4X800mg.  *Id*.  at 557.

On May 8, 2014, Dr. Rothner completed a Multiple Impairment Questionnaire concerning Plaintiff. Tr. at 627.  He indicated that he first started treating Plaintiff around 2000, he saw Plaintiff every 6 to 12 months, and his most recent examination of Plaintiff was on April 30, 2014.  *Id*.  He diagnosed Plaintiff with neurofibromatosis type 1 and scoliosis and he listed his prognosis as guarded for Plaintiff.  *Id*.  As to the questions asking Dr. Rothner to identify the positive clinical findings, laboratory and diagnostic test results  supporting the diagnoses and Plaintiff's symptoms, he wrote "see attached documentation."  *Id*. at 627-628.  He also indicated the same for questions asking him to address Plaintiff's pain, including its nature, location, frequency, and precipitating factors.  *Id*. at 628-629.  He opined that Plaintiff's pain level was a 7 on the pain scale, with 10 being the most severe, and he rated Plaintiff fatigue level at 4 out of 10.  *Id*. at 629.  He opined that Plaintiff could sit and stand/walk for up to 4 hours per day, but he could not sit continuously in a work setting and would have to get up and move around every 2 hours.  *Id*. He opined that Plaintiff could then sit again after 15 minutes.  *Id*. at 630.  He opined that he could not answer the questions about Plaintiff's ability to lift objects because Plaintiff's ability to lift and carry was less than normal for his age due to his back pain and scoliosis.  *Id.*  Dr. Rothner further opined that Plaintiff had significant limitations in repetitive reaching, handling, fingering and lifting due to his severe scoliosis, neurofibromatosis and back pain.  *Id*. When asked for specifics, Dr. Rothner indicated that he was unable to quantify, but it would be less than normal.  *Id.* at 631.  Dr. Rothner indicated that he had unsuccessfully tried to change Plaintiff's medications in order to produce less symptoms or side effects, and Plaintiff had undergone a T1-S1 spinal fusion as well.  *Id*.  He opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment and his condition interfered with the ability to keep his neck in a constant position.  *Id*.  He also opined

that Plaintiff could not perform a full-time competitive job that required such activity on a sustained basis.  *Id.* at 632.  Dr. Rothner further opined that Plaintiff's pain, fatigue or other symptoms were frequently severe enough to interfere with attention and concentration, his impairments were ongoing so as to create an expectation that they would last at least 12 months, and emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations.  *Id*. He indicated that Plaintiff was not a malingerer, he was capable of tolerating low stress, he would experience good and bad days, and Plaintiff was likely to miss work more than three times per month due to his impairments or treatment.  *Id*. at 632-633.  Dr. Rothner further indicated that Plaintiff would need ready access to a restroom, he had psychological limitations, and he could not push, pull, kneel, bend or stoop.  *Id.* at 633.  He estimated that the earliest date that Plaintiff's symptoms and limitations began was in childhood.  *Id.*

On May 10, 2014, Dr. Kuivila completed a completed a Multiple Impairment Questionnaire concerning Plaintiff.  Tr. at 636.  He indicated that he first started treating Plaintiff on June 23, 2003 and he last examined him on October 11, 2013.  *Id*.  He diagnosed Plaintiff with neurofibromatosis type 1 and scoliosis and he listed his prognosis as guarded for Plaintiff.  *Id*.  He noted that Plaintiff's pain and deformity were for his lifetime and he had the potential for other issues due to the growth of spinal neurofibromas.  *Id*.  Dr. Kuivila identified radiographs supporting the scoliosis diagnosis and examination and MRI as support for the neurofibromatosis and neurofibromas.  *Id*. He listed pain, depression due to chronic pain, and fatigue as symptoms of Plaintiff and he opined that Plaintiff's symptoms and functional limitations were consistent with his impairments.  *Id*. at 636-637.  He indicated the nature of Plaintiff's pain as chronic pain secondary to nerve involvement by fibromas, he noted the location of the pain as in Plaintiff's back, neck and base of his skull, and he described the pain as constant and exacerbated by activity.  *Id*. at 637-638.

Dr. Kuivila  opined that Plaintiff's pain level was an 8-9 on the pain scale, with 10 being the most severe, and he rated Plaintiff fatigue level at 5-7 out of 10.  Tr. at 638.  He opined that Plaintiff could sit for 5-6 hours per day and stand/walk for 0-1 hours per day, but he could not sit continuously in a work setting and would have to get up and move around every 2 hours.  *Id*. He opined that Plaintiff could then sit again after 10 minutes.  *Id*. at 638.  He opined that Plaintiff could

-10-

frequently lift up to 10 pounds, occasionally lift 10 to 20 pounds, frequently carry up to 5 pounds, occasionally lift and carry between 10 to 20 pounds, and never lift and carry over 20 pounds. *Id.* at 639. Dr. Kuivila also opined that Plaintiff had significant limitations in repetitive reaching, handling, fingering and lifting due to his strength issues and pain. *Id.* When asked for specifics, Dr. Kuivila indicated that Plaintiff was moderately limited in grasping, turning and twisting objects with his right and left hands, minimally limited in using his right and left fingers and hands for fine manipulations, and markedly limited in using his right and left arm for reaching, including overhead. *Id.* at 639-640.

Dr. Kuivila further opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment and his condition interfered with the ability to keep his neck in a constant position. Tr. at 640. He opined that Plaintiff's pain, fatigue or other symptoms were frequently severe enough to interfere with attention and concentration, his impairments were ongoing so as to create an expectation that they would last at least 12 months, and emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* Dr. Kuivila indicated that Plaintiff was not a malingerer, he was incapable of even low stress due to pain and anxiety, and he would have to take unscheduled breaks of 20 minutes on a daily basis. *Id.* at 641. Dr. Kuvilia further indicated that Plaintiff would likely miss work more than three times per month due to his impairments or treatment. *Id.* at 642. He further indicated that Plaintiff would need ready access to a restroom, he had psychological limitations, and he could not push, pull, kneel, bend or stoop. *Id.* He estimated that the earliest date that Plaintiff's symptoms and limitations began in May of 2009. *Id.*

### B.    **Testimonial Evidence**

At the ALJ hearing held on April 11, 2014, Plaintiff was present with counsel, as well as a VE and the ALJ. Tr. at 39. Plaintiff testified that he lived with his parents, he never had a driver's license and he had completed high school. *Id.* at 46-48. Plaintiff explained that he had no past relevant work because he is physically incapable of bending or moving side to side because of the rods in his back. *Id.* He also indicated that he is in chronic pain and has to keep his feet elevated because sitting or standing would make his feet swell and turn purple. *Id.* Plaintiff testified that he

took Gabapentin, Tramadol, Tizanidine and wore two Lidocaine patches per day. *Id*. at 49.  His last surgery was on October 20, 2011. *Id*.

Plaintiff described a typical day as waking up, cleaning up and trying to find something to eat that he could cook that did not require him to stand for very long, and then he would vacuum and take laundry down to the basement.  Tr. at 50.  He indicated that his bedroom was on the first floor of the house but the only bathroom was on the second floor.  *Id*.  He stated that he could walk the thirteen stairs from the first floor to the second floor to use the bathroom two to three times per day. *Id*. at 50-51.  He explained that he could not actually do the laundry because he could not bend at all and would have to slowly crouch down and stand back up if necessary.  *Id*. at 51.  Plaintiff indicated that he experienced bad days at least half of the days each month where he could get out of bed after an hour of laying in bed after he wakes up, but then he would just sit or lay on the couch all day. *Id.* at 53.

Upon questioning from his counsel, Plaintiff testified that he elevated his feet for eight hours per day or whenever he was sitting.  Tr. at 55.  He related that the neurofibromatosis made him feel like he could not do a lot because it felt like constant pinching pressure on him throughout most of the day. *Id*. at 56.  He indicated that the pain was mostly in his back and despite the fact that he had surgery to remove one of the tumors, his back still hurt as the doctors had only removed one tumor on the outer skin that had hurt the most.  *Id*. at 57.  Plaintiff testified that the tumors are going down the nerve endings of his entire spine.  *Id*.  Plaintiff also discussed his scoliosis, explaining that while his spine was straightened through surgery, his back pain has increased.  *Id*. at 57.  He testified that he was not sure which condition caused which pain in his back.  *Id.* at 58.

Plaintiff testified that he could stand for about 30 to 45 minutes at a time before having to take a break and he could possibly walk one block.  Tr. at 58.  He estimated that he could sit in an office chair for three hours out of an eight-hour day and he could stand/walk about the same.  *Id.* at 59-60.  However, he also indicated that sometimes the pain is so bad in his back that he has to lay down twice a day for at least one hour each time.  *Id.*  at 60.  When the ALJ asked if Plaintiff had looked into taking college or online classes, Plaintiff responded that he had, but he did not think that he could sit in a classroom and could not take classes online as he would not have anyone there to

explain things to him that he did not understand.  *Id.* at 60-61.  He indicated that he plays cards with his parents sometimes and he plays guitar, but he has to take breaks.  *Id.* at 60.  Plaintiff testified that he cannot perform any of these activities on his "bad days" and spends most of these days lying down.  *Id.* at 61.

The ALJ asked Plaintiff about his use of a cane, and Plaintiff explained that he has used a cane for the last two years.  Tr. at 62.  He testified that his legs buckle because of his ankles and knees and neuropathy.  *Id.* at 62.  He described the feeling in his legs as a bee sting pressure that he experiences a couple of times a day and his legs turn purple and then start swelling.  *Id.* at 63-64.  He elevates his legs to help alleviate his symptoms.  *Id.* at 64.

The ALJ then questioned the VE.  Tr. at 64.  The ALJ posed a hypothetical individual the same age as Plaintiff, with the same education and work experience and a limitation to sedentary work with the following additional limitations: frequent pushing and pulling with bilateral lower extremities; no limitations with the upper extremities; occasional climbing of ramps and stairs; occasional balancing, kneeling, crouching and crawling; no stooping or climbing of ladders, ropes and scaffolds; no exposure to hazards, hazardous machinery or unprotected heights; no commercial driving; unskilled work; no tasks with high production demands, quotas or fast-paced demands such as assembly-line production, but the individual could perform goal-oriented work such as office cleaning; only superficial interaction with co-workers and the public; no tasks involving persuading others, arbitration, negotiation, consultation, directing the work of others, or being responsible for the safety or welfare of others; and infrequent changes.  *Id.* at 66-67.  The VE testified that such a hypothetical individual could perform work as a parimutuel ticket checker, a polisher of eyeglass frames, and an addresser.  *Id.* at 68.  The VE reduced the number of these jobs by half in order to account for the ALJ's never bending limitation that he used in defining stooping.  *Id.*

The ALJ asked the VE whether the additional limitations of avoiding the extreme cold and using a cane would change the jobs she testified about or their numbers, and the VE responded that they would not.  Tr. at 69.

The ALJ further asked the VE whether jobs would be available for a hypothetical individual who was unable to sustain a 40-hour workweek on a regular and consistent basis, and the VE

-13-

responded that no jobs existed for such an individual.  Tr. at 70-71.  The VE affirmed that if the sitting, standing and walking time for the hypothetical individual would be less than eight hours, no jobs would be available for that individual.  *Id*. at 71.  The VE also responded to the ALJ's question concerning absenteeism that an individual could be absent no more than one or two times per month on a consistent basis in order to keep the employment.  *Id.*  The ALJ asked about a hypothetical individual having to lie down and the VE responded that needing to have a place to lie down in and of itself would be an accommodation and therefore no jobs would exist for such an individual, as well as for an individual who had to elevate his feet to waist level at least one time per day because that would also require an accommodation.  *Id.* at 72.  The ALJ also asked about a hypothetical individual who would be off task and the VE responded that an individual could be off task no more than 10% of the workday.  *Id*.

### III.  ALJ'S DECISION

In her decision, the ALJ acknowledged that Plaintiff had filed a previous application for SSI on April 25, 2006 and a previous ALJ issued a decision on March 27, 2009, finding that Plaintiff was not disabled.  Tr. at 22.  The current ALJ applied *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), and found that Plaintiff had presented new and material evidence showing a significant change in his physical condition such that the prior residual functional capacity ("RFC") determined by the previous ALJ was not binding.  *Id.*  The current ALJ cited to the Tl-L1 posterior spinal arthrodesis that Plaintiff underwent as the new and material evidence*. Id.*

The ALJ found that Plaintiff had the severe impairments of neurofibromatosis, status post T1-L1 posterior spinal arthrodesis, scoliosis and kyphoscoliosis, torticollis, neuropathy, and major depression disorder.  Tr. at 24.  She further found that these impairments, individually or in combination, did not meet or equal any of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *Id*. at 24-25.  The ALJ thereafter determined that Plaintiff had the RFC to perform sedentary work with the following limitations: he can push/pull frequently with his bilateral lower extremities; he may need a cane for ambulation; he can occasionally climb ramps and stairs; he can balance, kneel, crouch and crawl, but he cannot stoop; he cannot climb ladders,

scaffolds or ropes; he should avoid hazards such as dangerous machinery and unprotected heights and no commercial driving; he should avoid extreme cold; he can perform unskilled work that involves routine tasks and infrequent changes; he cannot perform tasks with high production demands or quotas or with demands for fast pace (e.g. assembly line production) but he can perform goal-oriented work (e.g. office cleaner); he can have superficial interactions with coworkers and the public, which does not involve persuading others, arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others; and he can perform work in a static setting without infrequent changes. *Id*. at 27.

In determining Plaintiff's RFC, the ALJ considered the opinions of Plaintiff's treating physicians, Drs. Kuivila and Rothner, but gave all of those opinions "little" or "some" weight, indicating that the opinions were not consistent with the record as a whole, including testimony from Plaintiff concerning his daily living activities and his testimony and records indicating that pain medications made his pain stable. Tr. at 27-31. With the RFC that she determined for Plaintiff, and reliance upon the testimony of the VE, the ALJ determined that Plaintiff could perform a number of jobs existing in significant numbers in the national economy, including the representative jobs of ticket checker, polisher of eyeglass frames, and addresser. *Id*. at 33-34. The ALJ therefore determined that Plaintiff was not under a disability as defined in the Social Security Act since January 12, 2012, the date that he filed his application. *Id*. at 34.

## IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

-15-

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ

-16-

may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI. LAW AND ANALYSIS

### A. Treating Physician Rule

Plaintiff first argues that the ALJ failed to properly evaluate and weigh the medical opinions of Dr. Kuivila, Plaintiff's treating orthopedic surgeon, and Dr. Rothner, Plaintiff's treating neurologist. ECF Dkt. #10 at 11-17. The undersigned agrees and recommends that the Court remand the instant case for further evaluation of and explanation of the treatment of the treating physicians' opinions.

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet

-17-

the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

The ALJ addressed each of the opinions by Drs. Kuivila and Rothner.  Tr. at 28-31.  In affording the three opinions by Dr. Kuivila and the one opinion of Dr. Rothner only "some weight," the ALJ addressed each opinion and mainly relied upon the same three issues in affording them less than controlling weight:  normal clinical examination findings, the stability of Plaintiff's pain, and Plaintiff daily living activities.

In his December 9, 2011 opinion letter, Dr. Kuivila, Plaintiff's treating surgeon and Residency Program Director at the Cleveland Clinic Children's Hospital, indicated that Plaintiff had undergone a 13-level posterior spinal arthrodesis on October 20, 2011 which required placement of instrumentation at those levels and 8 levels of posterior osteotomies to improve Plaintiff's mobility from the scoliosis caused by neurofibromatosis.  Tr. at 300.  Dr. Kuivila also had removed a large plexiform neurofibroma on the left of Plaintiff's mid-back during the surgery.  *Id*. at 288.  Dr. Kuivila opined that Plaintiff would be fully unable to work for the next year due to his limited mobility, postoperative pain and inability to perform any significant lifting.  *Id.*  He also opined that even after the one-year period, Plaintiff would have diminished abilities to walk and stand and would be unable to lift anything more than 15 pounds and could not do so repetitively because of the spinal fusion.  *Id.*

-18-

The ALJ afforded this opinion less than controlling weight, finding that "it was not consistent with the probative evidence." Tr. at 29. She gave the opinion only "some weight." *Id*. In doing so, she cited a February 2012 examination of Plaintiff by Dr. Rothner, Plaintiff's treating neurologist, who noted normal clinical findings, x-rays showing stable post-operative changes, and also noted that medications were controlling Plaintiff's pain. *Id*.

Dr. Kuivila penned another opinion in October of 2012, reiterating a description of Plaintiff's spinal surgery and Plaintiff's numerous cutaneous plexiform neurofibromas. Tr. at 497. He acknowledged normal clinical findings and nevertheless opined very restrictive limitations for Plaintiff. Tr. at 497. He specifically noted that "[a]t this time, his [Plaintiff's] neurologic status with respect to strength, reflexes, gait, etc. are normal." *Id*. However, Dr. Kuivila went on to state in the very next sentence that "[b]ecause of his neurofibromatosis and his persistent spinal deformity he does, however, have significant physical limitations with respect to how long he can sit, how far he can walk and what he can lift." *Id*. Dr. Kuivila further indicated that "[g]iven the number of neurofibromas he has both with respect to cutaneous manifestations and adherent deep to various nerve roots pose significant risk for malignant degeneration in the future." *Id*. He also stated that, "[i]n summary, his [Plaintiff's] pain issues and physical limitations lead me to believe that he is not a candidate for fulltime gainful employment at anytime in his life. I expect that his overall physical functions will continue to slowly deteriorate and while medications will be able to keep his pain stable I do not believe that he will ever by[sic] pain free. I support his applications for SSI..." *Id*.

The ALJ also gave this opinion less than controlling weight and in fact gave the opinion only "little weight." Tr. at 29. For support, she noted that Plaintiff had normal clinical findings in December 2012, except for an antalgic gait and walking with a cane. *Id*. The ALJ further indicated that in May of 2013, Plaintiff had a normal clinical examination and was weaned off of Oxycodone, although Plaintiff was told to increase his Tramadol dosage and Neurontin dosage, and to continue his Lidoderm patches. *Id*. The ALJ also noted that Plaintiff continued to take Tramadol, Tizandine, Gabapentin and Lidocaine patches in October 2013, which "strongly" suggested to her "that his pain was stable." *Id*. at 30.

Dr. Rothner, Plaintiff's treating neurologist since 2000, completed an impairment questionnaire on May 8, 2014, indicating that his most recent examination of Plaintiff was on April 30, 2014, and he concluded that his prognosis for Plaintiff was guarded. Tr. at 627. He rated Plaintiff's pain as a 7 on a scale of 10 and indicated that medications did not completely eliminate Plaintiff's pain and he could sit and stand/walk up to four hours per day each, but he had to get up and move around every 2 hours and he had significant limitations in repetitive reaching, handling, fingering or lifting and he could not push, kneel, bend or stoop due to his severe scoliosis, back pain and neurofibromatosis. *Id.* at 630. Dr. Rothner further opined that Plaintiff's symptoms would increase if he was placed in a competitive work environment, he could not keep his neck in a constant position, his impairments would last at least twelve months, and he would be absent from work more than three times per month due to his impairments or treatment. *Id.* at 632-634. This restrictive opinion was drafted after Dr. Rothner's April 30, 2014 examination of Plaintiff where Dr. Rothner found a relatively normal physical examination, but for fibromas on Plaintiff's skin, particularly a bump on his forearm that was growing and becoming more painful. *Id.* at 584.

Dr. Kuivila also completed an impairment questionnaire on May 10, 2014, indicating that his prognosis for Plaintiff was also guarded and finding that Plaintiff's pain level was a 9 out of 10, he could sit 5-6 hours per day and walk/stand 0-1 hours per day, Plaintiff had to get up and move around every 2 hours, he had restrictive lifting limitations, significant repetitive reaching, handling and fingering limitations, he could not push, pull, kneel, bend or stoop, his symptoms would increase if placed in a competitive work setting, he could not keep his neck in a constant position, the impairments would last at least 12 months, and Plaintiff would be absent more than three times per month from work due to his impairments or treatment. *Id.* at 640-642.

In attributing less than controlling weight and again in fact only "some weight" to these last two opinions, the ALJ found that the opinions were "not consistent with the probative evidence," including a May 2013 relatively normal physical examination, and the fact that Plaintiff's pain was stable with medication. Tr. at 31. The ALJ also noted that Plaintiff's daily living activities of vacuuming, preparing meals, using a computer, playing video games, playing a guitar and playing

cards and going out to eat with friends were inconsistent with the limitations that the treating physicians described.  *Id*.

The undersigned recommends that the Court find that the ALJ has not sufficiently evaluated and addressed the opinions of Drs. Kuivila and Rothner, Plaintiff's long-time treating specialists, in determining that their opinions were entitled to less than controlling weight and in fact only "little" or "some" weight.  While the ALJ cited to some instances of normal clinical examinations as support for her finding, the undersigned points out that Dr. Kuivila acknowledged the normal clinical examinations, yet he nevertheless opined many severe physical restrictions for Plaintiff due to his neurofibromatosis, spinal surgery, scoliosis and pain.  Tr. at 28-31, 300, 497, 627-634. Further, Dr. Rothner referred to his notes which also showed normal examinations, and he nevertheless also opined significant physical limitations for Plaintiff.  *Id*. at 636-643.  Both of these specialists who had treated Plaintiff for many years acknowledged normal clinical examinations, referred to the MRIs and x-rays which showed numerous neurofibromas on Plaintiff's spine and which were occupying his sacral neural foramen, as well as his mild to spinal stenosis, mild to moderate spondylosis with cord contact at C6-C7, worsening of a disc bulge at C5-C6 and other bilateral neural foraminal masses consistent with neurofibromatosis.  *Id*. at 579-580.  Yet, they nevertheless opined severe physical restrictions for Plaintiff.  *Id.* at 579-580.  The ALJ did not address their acknowledgments.

Moreover, the ALJ did not address in her decision the parts of the opinions of both Dr. Kuivila and Rothner that concluded that despite normal clinical examinations, Plaintiff could still not push, pull, kneel, crouch, or crawl, he could not frequently lift and carry objects, he had significant limitations in repetitive reaching, handling, and fingering, he had to get up and move around every two hours, he could not keep his neck in a constant position, and he would be absent from work more than three times per month due to his impairments and treatment.  Tr. at 27.  And the ALJ did not present many of these limitations to the VE in a hypothetical individual even though such limitations would erode the sedentary job base.  *See* Social Security Ruling 96-9p (indicates that occupational base eroded if claimant needs sit/stand alternative and occupational base is significantly eroded if claimant has significant limitation in handling and working with small

-21-

objects).  The ALJ did ask the VE about whether jobs would be available to a hypothetical individual who had certain limitations, including the inability to work a 40-hour workweek, or the inability to sit, stand/walk for eight hours, or would be absent more than three times per month as opined by Plaintiff's treating specialists.  *Id*. at 70-71.  The VE responded that a hypothetical individual with each of these limitations and the other limitations by the ALJ would result in no jobs being available for the individual.  *Id*.  The ALJ did not include these limitations in her RFC for Plaintiff, despite the opinions of Plaintiff's treating specialists opining that Plaintiff had such limitations, and she failed to explain why she did not accept these limitations and/or did not include these limitations in her RFC for Plaintiff.

Further, the ALJ's reliance upon her presumption that Plaintiff's pain was stable because he continued to take numerous and high-dosage pain medications is also insufficient to afford less than controlling weight to the opinions of Drs. Kuivila and Rothner.  Dr. Kuivila acknowledged that the medications kept Plaintiff's pain stable, but he opined that Plaintiff would never be pain-free and this pain, coupled with Plaintiff's physical limitations caused by his neurofibromatosis, prevented Plaintiff from being able to sustain full-time employment.  Tr. at 497.  Dr. Rothner also opined that he had tried to change Plaintiff's medications in order to reduce his symptoms and side effects, but was not successful in doing so.  *Id*. at 631.

In addition, the undersigned recommends that the Court find that the ALJ's reliance upon Plaintiff's daily living activities as evidence to support her decision to attribute "little" or "some" weight to the opinions of Drs. Kuivila and Rothner is also insufficient.  The ALJ concluded that Plaintiff engaged in a "significant level of daily activity," which was inconsistent with disability. Tr. at 31. In support, the ALJ cited to Plaintiff's activities of vacuuming, climbing steps two or three times a day, and taking his clothes to the basement laundry and washing them.  Tr. at 31.  She also cited to Plaintiff preparing meals, sitting at a computer, playing video games, playing a guitar and going out to eat with his friends and playing cards with his friends.  *Id*.  Plaintiff testified that he could perform these activities on his "good days," which is not inconsistent with the treating specialists' opinions that Plaintiff was severely limited and could not perform sustained competitive employment on a full-time basis.  Plaintiff testified that on his "bad days," which he experiences

over half of each month, he has to stay in bed for one hour after he wakes up, and then he just sits or lays down on the couch the whole day and cannot engage in any of his "good day" activities. *Id.* at 53, 61. Moreover, the ALJ failed to point out that Plaintiff climbs steps two to three times per day because his bedroom is located on the first floor of the house and the only bathroom is located on the second floor. *Id*. at 50. Plaintiff also testified that he could not actually do the laundry because he cannot bend at all and would have to slowly crouch down and stand back up if necessary. *Id*. at 51. He further indicated that when he can play cards or guitar, he has to take breaks. *Id*. at 60. He further explained that his neurofibromatosis limits him because it feels like constant pinching pressure on his body throughout most of the day and despite the fact that doctors had removed one of the larger tumors on his back, he still felt a lot of pain because the other tumors go down the nerve endings of his entire spine. *Id*. at 57.

The ALJ failed to address these contrary facts and findings provided by Plaintiff and his treating specialists concerning his daily living activities. Accordingly, the undersigned recommends that the Court find that the ALJ's reliance upon Plaintiff's daily living activities to give less than controlling weight to the opinions of Drs. Kuivila and Rothner is inadequate.

In summary, without an adequate explanation by the ALJ of her decision not to incorporate the limitations of Plaintiff's treating specialists who addressed the very facts that the ALJ relied upon in attributing less than controlling weight to their opinions, the undersigned recommends that the Court find that the ALJ inadequately evaluated the opinions of Drs. Kuivila and Rothner.

As the Sixth Circuit recognizes, a violation of the good reasons requirement could constitute harmless error in three circumstances: (1) where the treating source's opinion was patently deficient; (2) where the Commissioner made findings consistent with the treating source's opinion; or (3) where the Commissioner otherwise met the goal of 20 C.F.R. § 416.927(c)(2). Cole, 661 F.3d at 940. Here, the opinions of Drs. Kuivila and Rothner were not patently deficient on their faces, the ALJ did not make findings consistent with those opinions, and the goal of the regulation was not otherwise met because the ALJ's decision does not permit meaningful judicial review. As the VE testified at the hearing, many of the limitations opined by Plaintiff's treating specialists, if accepted by the ALJ, would have led to a finding of disability. Accordingly, the undersigned recommends

-23-

that the Court find that the ALJ's failure to adequately address the opinions of Drs. Kuivila and Rothner was not harmless error.

### B. Credibility

Plaintiff additionally argues that the ALJ did not properly evaluate his credibility, ECF Dkt. #10 at 17-20. In light of the undersigned's recommendation that the Court remand the instant case because the ALJ's RFC determination failed to comply with the treating physician rule, the undersigned further recommends that the Court decline to address this remaining allegation as the ALJ's re-evaluation and analysis on remand may impact her findings on this issue in the remaining steps of the sequential evaluation. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 417 (6th Cir. 2011).

## VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND Plaintiff's case for reevaluation of the opinions of Drs. Kuivila and Rothner and further analysis and explanation of the ALJ's treatment of said opinions.

Date: November 23, 2016                    */s/George J. Limbert*
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

-24-